J-A10021-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TAMEIKA OLIPHANT | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MINHV V. THAI AND  KHEIM L. THAI | : | No. 2015 EDA 2019 |

Appeal from the Judgment Entered August 7, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 130502929

BEFORE:   BOWES, J., SHOGAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SHOGAN, J.:                **FILED SEPTEMBER 18, 2020**

Appellant, Tameika Oliphant, appeals from the judgment entered in favor of Appellees, Minhv V. Thai and Kheim L. Thai (the "Thais"), on August 7, 2019, in the Court of Common Pleas of Philadelphia County.  We affirm.

This case stems from a claim that undisclosed water and mold damage existed at the subject residential property, 269 West Calvert Street, in Philadelphia, Pennsylvania, prior to Appellant's purchase of the property on May 31, 2011.  The initial complaint was filed on May 29, 2013, and was amended on March 28, 2014.  It included three counts:  breach of contract, fraud-misrepresentation, and violation of the Unfair Trade Practices and

_____

[*]  Retired Senior Judge assigned to the Superior Court.

Consumer Protection Law ("UTPCPL").[1]  The matter was heard before a board of arbitrators on April 30, 2014, who ruled in favor of the Thais.  On May 23, 2014, Appellant filed an appeal of the Award of Arbitrators' decision.  On March 2, 2015, the matter was marked "Settled Prior to Assigned Trial."  On June 12, 2017, Appellant filed a complaint in Equity/Rescission against the Thais in the Philadelphia Court of Common Pleas to rescind the March 2, 2015 Settlement Agreement, alleging that at the time of settlement, the Thais failed to disclose all of their assets upon which the Settlement Agreement was reached.  On the day scheduled for trial, September 18, 2018, the parties settled the rescission action.  The settlement entered into between the parties was rescinded.  This matter was ordered reinstated and was listed for trial on March 15, 2019.

The bench trial proceeded on March 18, 2019.  At the conclusion of the hearing, the court found in favor of the Thais.  On March 27, 2019, Appellant filed a post-trial motion seeking an opening of the judgment.  Oral argument was held on April 25, 2019, at which time Appellant's post-trial motion was denied.  Appellant appealed on May 9, 2019.  Appellant and the trial court complied with Pa.R.A.P. 1925.

On August 5, 2019, this Court directed Appellant to show cause why the appeal should not be quashed because final judgment had not been entered

_____

[1]  73 P.S. §§ 201-1 - 201-9.3

on the trial court docket as required by Pa.R.A.P. 301. On August 7, 2019, Appellant filed a praecipe for entry of the judgment with the trial court. The trial court entered judgment on the docket on August 7, 2019.[2]

On appeal, Appellant presents the following issue for our review:

> Whether the trial court committed error in failing to find that water and mold damage at [the] subject property occurred prior to [the] May 31, 2011 purchase by [Appellant] from [the Thais] and that [the Thais] failed to disclose said material defects. Subject property is 269 Calvert Street, Philadelphia, PA 19120.

Appellant's Brief at 7 (full capitalization omitted).

"Our review of the trial court's decision after a non-jury trial is limited to determining whether the findings of the trial court are supported by the competent evidence and whether the trial court committed error in the application of law." *Kornfeld v. Atl. Fin. Fed.*, 856 A.2d 170, 173 (Pa. Super. 2004). It is not our role to pass on the credibility of witnesses, as the trial court clearly is in the superior position to do so. *Id.*

The fundamental ground for all of Appellant's claims is that she was the victim of alleged fraudulent misrepresentations by the Thais.

> In real estate transactions, fraud arises when a seller knowingly makes a misrepresentation, undertakes a concealment calculated to deceive, or commits non-privileged failure to disclose. *Sewak*

---

[2] Appellant filed her notice of appeal on May 9, 2019. Judgment was not entered, however, until August 7, 2019. "[E]ven though the appeal was filed prior to the entry of judgment, it is clear that jurisdiction in appellate courts may be perfected after an appeal notice has been filed upon the docketing of a final judgment." *Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 513 (Pa. Super. 1995). Thus, we will entertain the appeal because judgment subsequently has been entered. *Id.*

*v. Lockhart*, 699 A.2d 755, 759 (Pa. Super. 1997). "Fraud is a generic term used to describe anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Id.* (quotation omitted).

To prove fraud, a plaintiff must demonstrate by clear and convincing evidence:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Unsupported assertions and conclusory accusations cannot create genuine issues of material fact as to the existence of fraud.

*Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa. Super. 2002) (some internal citations omitted).

An individual who purchases goods, including real estate, may bring a private action to recover damages caused by another's "act or practice declared unlawful" by the UTPCPL. 73 P.S. 201–9.2. *See also In re Zisholtz*, 226 B.R. 824, 831 (Bankr.E.D.Pa.1998).

Section 201–3 provides that it is unlawful to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce" as defined by section 201–2(i)–(xxi). In addition to twenty specifically enumerated practices, the Act provides that "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" constitutes an "unfair or deceptive act or practice." 73 P.S. § 201–2(4)(xxi). In order to establish a violation of this catchall provision, "a plaintiff must prove all of the elements of common-law fraud." *Sewak*, 699 A.2d at 761.

In turn, to establish common law fraud, a plaintiff must prove: (1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5)

damage to the party defrauded as a proximate result. ***Rizzo v. Michener***, 401 Pa.Super. 47, 61, 584 A.2d 973, 980 (1990). A misrepresentation is material if it is of such character that if it had not been misrepresented, the transaction would not have been consummated. ***Sevin***, 417 Pa.Super. at 10, 611 A.2d at 1237.

***Colaizzi v. Beck***, 895 A.2d 36, 39-40 (Pa. Super. 2006).

Section 7303 of the Real Estate Seller Disclosure Law (RESDL), 68 Pa.C.S. §§ 7301-7314, provides:

Any seller who intends to transfer any interest in real property shall disclose to the buyer any material defects with the property known to the seller by completing all applicable items in a property disclosure statement which satisfies the requirements of section 7304 (relating to disclosure form). A signed and dated copy of the property disclosure statement shall be delivered to the buyer in accordance with section 7305 (relating to delivery of disclosure form) prior to the signing of an agreement of transfer by the seller and buyer with respect to the property.

68 Pa.C.S. § 7303.

Section 7308 of RESDL imposes an affirmative duty on the seller:

The seller is not obligated by this chapter to make any specific investigation or inquiry in an effort to complete the property disclosure statement. In completing the property disclosure statement, the seller shall not make any representations that the seller or the agent for the seller knows or has reason to know are false, deceptive or misleading and shall not fail to disclose a known material defect.

68 Pa.C.S. § 7308.

Review of the testimony given by Appellant's expert, Reginald Alston, at the bench trial is essential to our analysis. Mr. Alston, the owner of Serve Pro Spring Garden Fairmount, a mold remediation company, testified regarding the work his company performed at the subject property. N.T., 3/18/19, at 3-8. Mr. Alston explained that he was contacted by Appellant for an estimate

- 5 -

for remediation services. *Id.* at 8. Appellant advised Mr. Alston that she had received an air sampling and report, and she provided that report to Mr. Alston.[3] *Id.* at 8. Mr. Alston's company began the remediation work in April 2013. *Id.* at 13. Through the remediation process, water damage and mold were discovered. *Id.* at 14-45.

During his testimony, Appellant testified regarding two types of damage: 1) mold damage; and 2) water damage. With regard to the mold damage observed, Mr. Alston made the following statements:

> [Appellant's counsel]: So, these pictures were taken in April 2013?
>
> [Mr. Alston]. Correct.
>
> [Appellant's Counsel]: Now could you give an opinion how long you think this damage had been in this problem before?
>
> [Mr. Alston]. Based on, again, based on the pictures, **it is my opinion that the mold has been growing for awhile, and when I say awhile, probably two months, three months or better**. And the reason why I say that is because if you look at the bottom picture, you see that there is wet rot. But then if you look at the studs as it goes up, you see that it gets lighter and lighter, and part of what that is, is, you know, mold is just like any other thing. Best way for me to describe it, it is like a plant. You have to feed it food and water for it to grow. If you don't feed it food and water, it is just going to die. So with this and the way that the mold has been growing that high, it just tells me that that is a long term use.

---

[3] The air sampling and related report were not conducted by or prepared by Mr. Alston or his company. N.T., 3/18/19, at 6-8. Rather, the work was done by Able Inspectors, and the report was dated March 29, 2012. *Id.* at 6. No one from Able Inspectors testified at trial regarding the results or the report.

Now also with a visual inspection, also this air sample report tells me or gives me sort of a story or a background to how long the mold has been there. There are certain things in here like the stachybotrys; that is one of the things that is indicative of –

* * *

So that particular type of mold is indicative of long-term wet, long-term mold. That is not something you are going to see on an everyday mold test. Again, those numbers are extremely elevated, which tells us that this water has been sitting there for a long time.

Mold is going to grow within probably 48 to 72 hours, but when you have spore counts that high, that is telling you it has been sitting and growing and **growing for a very, very long time, and, again, I am talking about, and I will be on the generous side and say three months.** It probably was a lot longer than that.

N.T., 3/18/19, at 13-15 (emphases added).

The following exchange also occurred regarding Mr. Alston's observation

of the mold damage:

[Appellant's counsel]. So, let me be clear. **The spores, you are saying, probably three months. The water damage is another question**?

[Mr. Alston]. Correct.

N.T., 3/18/19, at 17 (emphasis added). Furthermore, on cross-examination,

Mr. Alston again opined that the mold growth would have been there "between

two to three months." *Id.* at 42.

Thus, Mr. Alston consistently testified that pursuant to what his

company observed when they began the work in April of 2013, the mold had

been growing for approximately three months. Accordingly, based on his

testimony, it cannot be concluded that the mold damage existed at the time of the sale of the house in May of 2011, almost two years prior to the time of the remediation work.

As noted, Mr. Alston distinguished the time-frame for mold growth from the time-frame of the water damage. Thus, we next consider his testimony regarding the water damage to determine whether Appellant established that the water damage occurred prior to the sale of the house in May of 2011.

The following exchange regarding the water damage took place on direct examination:

> [Appellant's counsel]. [Appellant] bought this property, and I think we can agree, on May 31, 2011.
>
> [Mr. Alston]. Okay.
>
> [Appellant's counsel]. Now in your opinion, did the water damage predate that?
>
> [Appellant's counsel]. Based on what we found, yes, because, again, it goes back to this, the bottom picture, the wet rot. That isn't going to happen overnight.
>
> [Defense counsel]: Objection, Your Honor. He just testified three months and–
>
> THE COURT: You can cross-examine him.
>
> [Mr. Alston]: You know, that is not -- here is a perfect for instance for me to explain it. You know, if you take a two-by-four and you take it to a lake and you throw it in the lake, how long before does that two-by-four take to turn brown? It is not going to be three days, it is not going to be 30 days. It is probably going to be six months or better. This is wood; same thing. You have given it a lot of water, so it is oversaturated, so it has no choice but to decay and turn black. **So that is where I get the long-term and, again, like I said, it could be six months, it could be a year.**

> **It is hard for me to define and put it into a box, but I can tell you this isn't something that is recent.**

N.T., 3/18/19, at 15-16 (emphasis added).

Appellant's counsel followed up with an additional question in an attempt to clarify Mr. Alston's testimony:

> [Appellant's counsel]. So, let me be clear. The spores, you are saying, probably three months. The **water damage** is another question?
>
> [Mr. Alston]. Correct.
>
> [Appellant's counsel]. You are saying that **may** have predated May 31, 2011?
>
> [Mr. Alston]. It is my opinion, just again, based on the mold, you know, **I can't really say when it is**, but, again, when I am looking at the material itself, the drywall, I am sorry, excuse me, the wood specifically, that is telling a story of old, you know, and, again, I am not talking about three months, four months. I am talking about, like, again, using that scenario if you throw it in the lake, how long does it take before it turns black and brown? It is going to be a long time because wood is made to be able to be, to hold water, but how much water can it hold for how long. So that is what, again, we are going back to with this stud. If you look at the top of that stud, the stud is very bright, very clean, very white, but if you look at the bottom of that stud, you can see that it is just saturated, you know what I mean, and it is just decayed and that was the beginning of the mold. Now the mold just traveled from there.

N.T., 3/18/19, at 17-18 (emphases added).

On cross-examination, the following exchange took place:

> [Defense counsel]. Can you tell me again what that photo indicates?
>
> [Mr. Alston]. Like I was saying before, the photo, if we look at the top photo, the studs to the right just indicate that they are older studs, that they have been there for some years. What I did

say was the black at the bottom represents wet rot, which is long exposure to water.

[Defense counsel]. You mentioned that that was a constant food source?

[Mr. Alston]. Correct.

[Defense counsel]. Could this have happened within three months, also?

[Mr. Alston]. Not the wet rot, no, I wouldn't say that.

THE COURT: I thought you testified it was three to six months –

[Mr. Alston]: Right, correct.

THE COURT: -- for the wood to be damaged.

N.T., 3/18/19, at 44-45.

Although Mr. Alston affirmatively answered counsel's question suggesting the answer that the water damage predated the sale of the house, N.T., 3/18/19, at 15, his testimony did not support that conclusion. As noted above, in expounding on his answer he stated that the water damage "could be six months, it could be a year. It is hard for me to define and put it into a box, but I can tell you this isn't something that is recent." *Id.* at 16. On follow-up, he clarified that the mold growth was approximately three months, but as far as the water damage, he "[couldn't] really say when it [was]." *Id.* at 17. Moreover, on cross-examination, Mr. Alston testified that it would take approximately three to six months for the wood to be damaged. *Id.* at 45. Mr. Alston's testimony was inconsistent on this issue. In construing his testimony most liberally, however, his statements could support the

conclusion that the water damage occurred one year before the remediation work was done on the house in April 2013. Mr. Alston's testimony is far from a solidly formed opinion that the water damage occurred before the sale of the house on May 31, 2011, almost two years before his company performed the remediation work. We further note that in making its determination, the trial court "did not find Mr. Alston's testimony to be credible or reliable given his contradictory testimony and lack of expertise." Trial Court Opinion, 7/12/19, at 2. "It is not our role to pass on the credibility of witnesses, as the trial court clearly is in the superior position to do so." *Kornfeld*, 856 A.2d at 173. Thus, Mr. Alston's testimony failed to establish that there was water or mold damage in the subject property prior to the sale of the property on May 31, 2011.[4]

Moreover, there was no other evidence presented at trial that established that the water or mold damage predated the sale of the house on May 31, 2011. Thus, our review of the record reflects that Appellant could not satisfy the evidentiary requirements supporting her claims for breach of contract, fraud-misrepresentation or violation of the UTPCPL in this matter. Accordingly, we are unable to conclude that the trial court erred in failing to

_____

[4] Without establishing that the property had water or mold damage prior to the sale of the house, we cannot consider the next relevant inquiry whether the Thais knew of any alleged damage at the time of the sale of the property. Obviously, individuals cannot be deemed to have knowledge of damage that does not exist.

find that the water damage predated the purchase of the subject property.

***Kornfeld***, 856 A.2d at 173.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/18/20